Rosemary M. Rivas (SBN 209147)
rrivas@zlk.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff Marc Nuzzo*

*[Additional Counsel on Signature Page]*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC NUZZO, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INVENSENSE, INC., BEHROOZ ABDI, AMIR FAINTUCH, USAMA FAYYAD, EMIKO HIGASHI, JON OLSON, AMIT SHAH, ERIC STANG, YUNBEI YU, TDK CORPORATION, and TDK SENSOR SOLUTIONS CORPORATION,<br><br>Defendants. | Case No. 5:17-cv-00859<br><br>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of the public stockholders of InvenSense,

Inc. ("InvenSense" or the "Company") against InvenSense and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on December 21, 2016 (the "Proposed Transaction"), pursuant to which InvenSense will be acquired by TDK Corporation ("Parent") and its wholly-owned subsidiary, TDK Sensor Solutions Corporation ("Merger Sub," and together with Parent, "TDK").

2. On December 21, 2016, the Board caused InvenSense to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of InvenSense will receive $13.00 per share in cash.

3. On February 3, 2016, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff, a resident and citizen of Martinsburg, West Virginia, is, and has been continuously throughout all times relevant hereto, the owner of InvenSense common stock.

9. Defendant InvenSense is a Delaware corporation and maintains its principal executive offices at 1745 Technology Drive, Suite 200, San Jose, California 95110. InvenSense's common stock is traded on the New York Stock Exchange under the ticker symbol "INVN."

10. Defendant Behrooz Abdi ("Abdi") has served as a director of InvenSense since June 2011. According to the Company's Annual Proxy Statement filed with the SEC on Form DEF 14A on July 29, 2016 (the "2016 Proxy"), Abdi was appointed as the Company's President and Chief Executive Officer ("CEO") in October 2012.

11. Defendant Amir Faintuch ("Faintuch") has served a director of InvenSense since October 2014. According to the 2016 Proxy, Faintuch is a member of the Nominating and Corporate Governance Committee.

12. Defendant Usama Fayyad ("Fayyad") has served as a director of InvenSense since January 2015. According to the 2016 Proxy, Fayyad is a member of the Compensation Committee.

13. Defendant Emiko Higashi ("Higashi") has served as a director of InvenSense since October 2014. According to the 2016 Proxy, Higashi is a member of the Audit Committee.

14. Defendant Jon Olson ("Olson") has served as a director of InvenSense since October 2011. According to the 2016 Proxy, Olson is Chairman of the Audit Committee.

15. Defendant Amit Shah ("Shah") has served as a director of InvenSense since April

2004.  According to the 2016 Proxy, Shah serves as Chairman of the Board and is Chairman of the Compensation Committee.

16. Defendant Eric Stang ("Stang") has served as a director of InvenSense since September 2013.  According to the 2016 Proxy, Stang is Chairman of the Nominating and Corporate Governance Committee and is a member of the Audit Committee.

17. Defendant Yunbein Yu ("Yu") has served as a director of InvenSense since March 2008.  According to the 2016 Proxy, Yu is a member of the Compensation Committee.

18. The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

19. Defendant Parent is a company organized under the laws of Japan with its corporate headquarters located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023 Japan.

20. Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of InvenSense (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22. This action is properly maintainable as a class action.

23. The Class is so numerous that joinder of all members is impracticable.  As of December 15, 2016, there were approximately 94,415,309 shares of InvenSense common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24. Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

28. Founded in 2003, InvenSense is the world's leading provider of micro electrical mechanical systems ("MEMS") sensor platforms.

29. The Company's solutions combine MEMS sensors, such as accelerometers, gyroscopes, compasses, and microphones with proprietary algorithms and firmware that intelligently process, synthesize, and calibrate the output of sensors, maximizing performance and accuracy.

30. InvenSense's motion tracking, audio and location platforms, and services can be found in many of the world's largest and most iconic brands including smartphones, tablets, wearables, drones, gaming devices, internet of things, automotive products, and remote controls for smart TVs.

31. On November 3, 2016, InvenSense issued a press release wherein it reported its financial results for the second quarter of fiscal year 2017. In the press release, the Company reported that net revenue for the second quarter was $79.8 million, up 32 percent from $60.6 million in the first quarter of fiscal year 2017. With respect to the results, Individual Defendant Abdi, President and CEO of the Company, commented:

> The InvenSense team delivered solid results in the second fiscal quarter. We are encouraged that our R&D investments are beginning to pay off with new design wins which we anticipate will allow us to penetrate new markets[.] . . . While the consumer and mobile markets were and remain soft, we believe this design win activity will position us for strong top line growth in fiscal 2018 as we strive to diversify our business.

32. Despite this outlook for "strong top line growth in fiscal 2018," the Board caused the Company to enter into the Merger Agreement, pursuant to which InvenSense will be acquired for inadequate consideration.

33. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 6.03(a) of the Merger Agreement states, in relevant part:

> (a) General Prohibitions. Neither the Company nor any of the Company Subsidiaries shall, nor shall the Company or any of the Company Subsidiaries authorize or permit any of its or their Representatives to, directly or indirectly,

(i) solicit, initiate or take any action to knowingly facilitate or knowingly encourage the making, submission or announcement of any inquiry, proposal or offer (including any inquiry, proposal or offer to the Company's stockholders) which constitutes or would be reasonably expected to lead to any Acquisition Proposal, (ii) enter into or participate in any discussions or negotiations with, furnish any information relating to the Company or any of the Company Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of the Company Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Third Party that is reasonably expected to make, or is otherwise seeking to make, or has made, an Acquisition Proposal (other than, solely in response to an unsolicited inquiry, to refer the inquiring Third Party to this Section 6.03 and to limit its conversation or other communication exclusively to such referral), (iii) (A) publicly propose to, or otherwise change, withhold, withdraw, qualify or modify, in a manner adverse to Parent or Merger Subsidiary, the Company Board Recommendation, (B) fail to include the Company Board Recommendation in the Proxy Statement, when mailed, (C) adopt, approve or recommend to stockholders of the Company, or resolve to or publicly propose or announce its intention to adopt, approve or recommend to stockholders of the Company, an Acquisition Proposal or any transaction pursuant to which a Third Party would become an "interested stockholder" under Section 203 of Delaware Law, (D) if a tender offer or exchange offer that constitutes an Acquisition Proposal is commenced, fail to publicly recommend against acceptance of such tender offer or exchange offer by the Company's stockholders within ten Business Days after the commencement thereof or (E) fail to publicly reaffirm the Company Board Recommendation following any Acquisition Proposal having been publicly made, proposed or communicated (and not publicly withdrawn) within 10 Business Days after Parent so requests in writing (*provided* that Parent shall not be entitled to request such reaffirmation more than one time with respect to an Acquisition Proposal (provided that any modification to the financial or other material terms of such Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of the foregoing) (any of the foregoing in this clause (iii), an "Adverse Recommendation Change"), (iv) fail to enforce or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of the Company Subsidiaries, provided that, with respect to any Third Party that was not invited by the Company to submit an indication of interest or bid to acquire the Company during the period between June 1, 2016 and the date of this Agreement, if the Company's Board of Directors determines in good faith, after consultation with the Company's outside legal counsel, that the failure to take such action would be inconsistent with the directors' fiduciary duties under Applicable Law, the Company may waive any such standstill provision applicable to such Third Party solely to the extent necessary to permit such Third Party to make a confidential Acquisition Proposal to the Company's Board of Directors, or (v) approve, adopt, recommend or enter into, or propose to approve adopt, recommend or enter into any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar instrument relating to an

Acquisition Proposal (whether binding or nonbinding). It is agreed that any material violation of the restrictions on the Company set forth in this Section 6.03 by any Representative of the Company or any of the Company Subsidiaries shall be a breach of this Section by the Company.

34. Further, the Company must promptly advise TDK of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Section 6.03(c) of the Merger Agreement states:

> (c) Required Notices. The Board of Directors of the Company shall not take any of the actions referred to in Section 6.03(b) unless the Company shall have delivered to Parent a prior written notice advising Parent that it intends to take such action, the Company has advised Parent on a prompt basis of the status and terms of any discussions and negotiations with the Third Party, and the Company has notified Parent promptly (but in no event later than the earliest to occur of (i) one Business Day and (ii) 48 hours) after receipt by the Company (or any of its Representatives) of any request for information relating to the Company or any of the Company Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of the Company Subsidiaries by any Third Party that has made, or that is reasonably likely to make, an Acquisition Proposal. The Company shall provide such notice orally and in writing (email shall be sufficient if sent in accordance with all of the relevant provisions of Section 11.01 hereof) and shall identify the Third Party making, and the financial and other material terms and conditions (including the financing thereof) of, any such Acquisition Proposal, indication or request. The Company shall keep Parent fully informed, on a prompt basis (and in any event no later than the earliest to occur of (i) one Business Day and (ii) 48 hours), of the status and material terms of any such Acquisition Proposal, indication or request. The Company shall promptly (but in no event later than the earliest to occur of (i) one Business Day and (ii) 48 hours) after receipt provide to Parent copies of all correspondence and other written materials sent or provided to the Company, any of the Company Subsidiaries or any of their Representatives after the date of this Agreement by any Third Party that has made, or that is reasonably likely to make, an Acquisition Proposal that describes any financial or other material terms or conditions of any Acquisition Proposal (as well as written summaries of any additional or modified material terms or conditions conveyed orally to the Company, to the extent not already provided to Parent within the earliest to occur of (i) one Business Day and (ii) 48 hours after receipt by the Company, any of the Company Subsidiaries or any of their Representatives). The Company shall provide to Parent prior to or substantially concurrently with the time it is provided or made available to such Third Party by the Company, any of the Company Subsidiaries or any of the their Representatives all correspondence and other written materials to any Third Party that, after the date of this Agreement, has made, or that is reasonably likely to make, an Acquisition Proposal that describes any financial or other material terms or conditions of any Acquisition

Proposal (as well as written summaries of any additional or modified material terms or conditions conveyed orally by or on behalf of the Company, to the extent not already provided to Parent). Any amendment to the financial or other material terms of any Acquisition Proposal will be deemed to be a new Acquisition Proposal for purposes of the Company's compliance with this Section 6.03(c).

35.  Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants TDK a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.03(d) of the Merger Agreement provides:

> (d) "Last Look". Further, the Board of Directors of the Company shall not make an Adverse Recommendation Change (or terminate this Agreement pursuant to Section 10.01(d)(i)), unless (i) the Company notifies Parent (which notice, in and of itself, shall not constitute an Adverse Recommendation Change), in writing at least five Business Days before taking that action, of its intention to do so (such period, the "Negotiation Period"), including (A) in the case of an Adverse Recommendation Change to be made following receipt of a Superior Proposal, the most current version of the proposed agreements under which such Superior Proposal is proposed to be consummated (including any proposed merger agreement, acquisition agreement, option agreement, voting agreement or other similar instrument relating to such Superior Proposal and a copy of any financing commitments relating thereto (or, in each case, if not provided in writing to the Company, a written summary of the financial and other terms thereof)) and the identity of the Third Party making the Acquisition Proposal, or (B) in the case of an Adverse Recommendation Change to be made in response to an Intervening Event, a reasonably detailed description of the reasons for making such Adverse Recommendation Change, and (ii) following the end of the Negotiation Period, the Board of Directors of the Company shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by Parent, and shall have determined, after consultation with its financial advisor and outside legal counsel, that Parent did not make, within the Negotiation Period, an offer that (A) in the case of an Adverse Recommendation Change to be made following receipt of a Superior Proposal, is at least as favorable to the stockholders of the Company as such Superior Proposal provided, that in the event there is any modification to the financial or other material terms of any such Superior Proposal (including any modification in the amount, form or mix of consideration proposed to be payable to the Company's stockholders pursuant to such Superior Proposal), the Company shall have provided to Parent a notice of such modification and such Superior Proposal shall be deemed a new Superior Proposal to which the requirements of this Section 6.03(d) shall apply; provided, further that with respect to such new Superior Proposal, the Negotiation Period shall be deemed to be a three Business Day period rather than a five Business Day period (except that in no

event will the Negotiation Period expire earlier than any Negotiation Period then in effect would have expired) or (B) in the case of an Adverse Recommendation Change to be made in response to an Intervening Event, obviates the need for such recommendation change.

36. The Merger Agreement also contains a provision for a "termination fee" of $46.7 million, payable by the Company to TDK if the Individual Defendants cause the Company to terminate the Merger Agreement.

37. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

38. Additionally, the directors, executive officers, and certain stockholders of the Company entered into a voting agreement with Parent, pursuant to which they agreed to vote their shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

39. The $13.00 per share merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

40. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

41. Additionally, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

42. The financial analyses performed by the Company's own financial advisor, Qatalyst Partners LP ("Qatalyst Partners"), confirm the inadequacy of the merger consideration. For example, Qatalyst Partners' *Illustrative Discounted Cash Flow Analysis* yielded values for the Company's common stock as high as $19.63 per share.

43. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

44. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

45. For example, the Company's officers will retain their positions following the close of the Proposed Transaction.

46. Additionally, Individual Defendant Abdi stands to receive $7,872,751 in connection with the Proposed Transaction, and the remainder of the Company's named executive officers stand to receive $12,813,145.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

47. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

48. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

49. The Proxy Statement omits material information regarding the Company's financial projections and the financial analysis performed by the Company's financial advisor, Qatalyst Partners, in support of its so-called fairness opinion.

50. With respect to Qatalyst Partners' *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the terminal value of the Company; (ii) the estimated debt outstanding of the Company; (iii) the estimated cash balance of the Company; (iv) management's inputs and assumptions for projecting a dilution factor of approximately 19%; (v) the inputs and assumptions used to calculate the discount rate range of 11.0% to 17.5%; (vi) the estimated debt

outstanding and estimated cash balance as of December 31, 2016, as provided by the Company's management; and (vii) the number of fully diluted shares of InvenSense common stock outstanding as of December 15, 2016, as provided by InvenSense's management.

51. When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

52. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Board of Directors"; (iv) "Certain Prospective Financial Information"; and (v) "Opinion of InvenSense's Financial Advisor."

53. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to InvenSense's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and InvenSense**

54. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

55. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to

make the statements therein not materially false or misleading.  InvenSense is liable as the issuer of these statements.

56. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

57. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

58. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

59. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

60. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

61. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

**COUNT II**

**Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and TDK**

62. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

63. The Individual Defendants and TDK acted as controlling persons of InvenSense

13

within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of InvenSense and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

64. Each of the Individual Defendants and TDK was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

65. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

66. TDK also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

67. By virtue of the foregoing, the Individual Defendants and TDK violated Section 20(a) of the 1934 Act.

68. As set forth above, the Individual Defendants and TDK had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934

14
CLASS ACTION COMPLAINT

Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 21, 2017        **LEVI & KORSINSKY LLP**

By:   /s/Rosemary M. Rivas
      Rosemary M. Rivas
      44 Montgomery Street, Suite 650
      San Francisco, CA 94104

Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff Marc Nuzzo*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310